# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE DIVISION

| | | |
|---|---|---|
| **SANDRA DURAND** | * | **CIVIL ACTION NO. 14-2350** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993.  Sandra Durand, born March 8, 1955, filed applications for a period of disability, disability insurance benefits and supplemental security income on May 31, 2011, alleging disability as of May 27, 2011, due to diabetes, hypertension, obesity, and disorders of the back.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards.  *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Psychiatric Review Technique ("PRT") by Pamela D. Martin, Ph.D., dated November 28, 2011**.  Dr. Martin determined that claimant had no restriction of activities of daily living, difficulties in maintaining social functioning, or difficulties in maintaining concentration, persistence or pace.  (Tr. 51).  She had no repeated episodes of decompensation.  She did not have any medical evidence to support the presence of a severe impairment.

**(2) Physical Residual Functional Capacity Assessments by Dr. Timothy Honigman dated September 14, 2011-January 31, 2012**.  On September 14, 2011, Dr. Honigman determined that claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit about six hours in an eight-hour workday, and had unlimited push/pull ability.  (Tr. 52-53).  She could occasionally climb ramps/stairs and ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl.  (Tr. 53).  She had no manipulative, visual, communicative, or environmental limitations.  Dr. Honigman's assessment was a light RFC.  (Tr. 252).

On January 31, 2012, Dr. Honigman determined that claimant had the same limitations, except that she was limited to reaching any direction (including overhead) bilaterally.  (Tr. 73).  She had a light RFC.  (Tr. 302).

**(3) Records from Iberia Comprehensive Community Health dated July 26, 2010 to June 27, 2011**.  On July 26, 2010, claimant reported not feeling tired or poorly, no headache, no localized swelling and no dizziness.  (Tr. 233).  Her blood pressure was 130/80.  She was 64 inches tall and her weight was 231 pounds.

Physical and mental examinations were normal.  (Tr. 233-34).  The impression was benign essential hypertension, hyperlipoproteinemia type II-B and diabetes mellitus.  (Tr. 234).  She was prescribed NovoLog (insulin), Lantus, Janument, Crestor, TRILIPIX, Micardis HCT and Norvasc.  (Tr. 238).

On February 15, 2011, claimant's estimated glucose average was 266, and Hemoglobin A1c was 10.9.  (Tr. 238).  She had poor diabetic control.  (Tr. 239).  The assessment was Type 2 diabetes mellitus with complication.  Her medications were adjusted.

On June 27, 2011, claimant complained of pain in the left lower pelvis, bilateral legs and hands.  (Tr. 242).  Her blood pressure was 152/82, and she

3

weighed 230 pounds.  She requested referral to University Medical Center ("UMC").

### (4) Consultative Examination by Dr. Scott C. Chapman dated August 24, 2011.  Claimant was referred for diabetes, hypertension, and hypercholesterolemia.  (Tr. 244).  She was on insulin and oral medications for diabetes.  She reported that her blood sugars ran between 211 and 230, and that she had never had good control of her blood sugars.  Her medications included Singulair, Bystolic, Novalog insulin, Janument, Nasonex spray and Micardis.  (Tr. 245).

Claimant had also had surgery for cataracts in both eyes due to diabetes. Additionally, she had developed short-term memory loss and tingling to the right side of her body.  She had been referred to UMC for a work up of the short-term memory loss and tingling.

Approximately five months prior, claimant had added another medication to her anti-hypertensive regimen.  She stated that since then, her blood pressure had been under good control.  Her cholesterol medications were discontinued about six months prior, and she was awaiting results from her cholesterol check.

On examination, claimant's blood pressure was 149/83.  Her height was 5 feet 4 inches, and weight was 230 pounds.  Her visual acuity without glasses was

4

OS 20/30; OD 20/25, and OU 20/25.

Generally, claimant was morbidly obese.  She was awake, alert, and oriented, and in no acute distress.  Her neck was moderate just to palpation over the C6 and C7 levels.

Claimant had a 2/6 systolic murmur of the heart.  She had moderate tenderness to palpation over the right sacroiliac joint.  Her dorsalis pedis and posterior tibial pulses were weak bilaterally.  (Tr. 246).

Neurologically, cranial nerves were intact.  Reflexes were absent. She had decreased light touch sensation in a distal right C7 dermatomal pattern.

Claimant had 5/5 motor strength throughout.  Grip strength/manual dexterity were within normal limits.  Movement and gait were normal.  No assistive device was used.  She could heel and toe walk, though it was painful.

On mental status exam, claimant's appearance was appropriate, and behavior was cooperative.  Speech was normal in content and rate.  Thought process and content were intact.  Mood was appropriate, and affect was congruent. Memory, concentration, and comprehension were intact.  Insight and judgment were good.

Dr. Chapman's impressions were metabolic syndrome and undiagnosed right-sided neurological changes.  He noted claimant had been diagnosed with all

three components of the metabolic syndrome.  (Tr. 247).  Her blood pressure appeared to be under adequate control, and her current cholesterol status was unknown.  However, her diabetes had never been under good control, and still ran in the lower 200s.  Due to the uncontrolled diabetes, she had developed multiple complications, including bilateral cataracts.

Dr. Chapman noted that claimant had also developed right-sided neurological changes.  On examination, she was noted to have tenderness over the lower cervical segments.  She also had a sensory neuropathy in a right C7 dermatomal pattern.  It was possible that she might have pathology in her cervical spine that was responsible for the neurological changes, for which she had been referred to UMC.

**(5) Consultative Examination by Alfred E. Buxton, Ph.D., dated November 14, 2011**.  Dr. Buxton noted that claimant was a high school graduate with two and a half years of college course work.  (Tr. 258).  She reported that she had last worked on May 20, 2011, as a human resource worker for a caregiving service, until she was "laid-off due to a downturn in the economy."  She had a valid driver's license and was a registered voter.

Claimant was on eight different prescriptive medications, none of which were psychoactive.  (Tr. 259).  Socially, she had adequate contact.  General

6

routine was non-descriptive.  Her primary hobby or pleasure was to window-shop.

She was able to cook, clean shop, manage money, travel, communicate and

manage time independently.

On examination, claimant's verbal receptive and expressive language skills,

dress and groom, and social skill were good.  Recent and remote memories were

intact.  Ability to attend and concentrate was good.  Pace was even with a regular

rate of performance and a normative response latency.

Intellect appeared to be within normal limits.  Judgment, reasoning and

reflective cognition were good.  Insight was fair.  Cognitions were clear and

cogent.  Mood was even with congruent affect.

Occasionally, claimant worried or became upset, then tended to fuss.  She

had occasional reflective dysphoria with episodic crying spells.  She was alert,

responsive, and oriented in all four spheres.

In summary, Dr. Buxton stated that claimant's intellect appeared to be

within normal limits, as were her adaptive daily skills, though perhaps there had

been some compromise secondary to some chronic pain issues.  She was regarded

as being competent as a manager of her own personal affairs.  Clinically, she

presented with an Adjustment Disorder, with Depressed Mood, with degree of

impairment mild to moderate and prognosis fair, and this being reactive to current

life stressors and complaints of chronic right shoulder, right hip, and right leg pain.  He opined that outpatient mental health intervention to deal with the adjustment disorder and pain complaints; counseling and the use of psychoactive medication, and medical monitoring and management of her Diabetes Mellitus Type 2, high blood pressure, high cholesterol, airborne allergies, and pain complaints, would be appropriate.

Claimant's Global Assessment of Functioning ("GAF") score was 55 over the last four months, 60 for three months prior, and 75 for five months prior to that.  Dr. Buxton observed that she was bright enough that she could understand simple as well as complex instruction and command.  (Tr. 260).  He stated that with adequate motivation and an emphasis on performing tasks that would not aggravate her pain complaints, then perhaps at a minimally adequate level she would be able to tolerate the frustration and stress she would encounter in the job setting.  He noted that she was friendly enough and should be able to establish and maintain mutually rewarding relationships with co-workers and supervisors alike.

Dr. Buxton opined that were claimant able to secure and maintain gainful within the general community at large, then that would be somewhat therapeutic for her.

**(6) Records from LSU dated March 3, 2010 to December 12, 2011**.  A chest x-ray taken on March 3, 2010, was normal.  (Tr. 296).

On February 25, 2011, claimant had cataract removal surgery and insertion of lens on the left side.[1]  (Tr. 268-73).

**(7) X-ray from Laborde Diagnostics dated December 21, 2011**.  Cervical spine x-rays showed early cervical spondylosis at C5-6 with anterior lipping.  (Tr. 298).

**(8) Records from University Medical Center ("UMC") dated March 30, 2012 to August 1, 2012**.  Lumbar spine x-rays dated March 30, 2012, were normal.  (Tr. 306).

On April 1, 2012, claimant complained of facial weakness.  (Tr. 304).  A CT of the brain revealed no acute intracranial abnormality.

**(9) Records from St. Martin Parish Community Health Center dated August 1, 2011 to January 8, 2013**.  On October 27, 2011, claimant was not taking her Novolog as ordered.  (Tr. 320).  She stated that she understood the risks with uncontrollable diabetes mellitus.

On January 19, 2012, claimant's glucose was 326 mg/dL.  (Tr. 325).  She had not taken her diabetes medications that day.  She stated that she would go

---

[1]Claimant had cataract surgery on her right eye on June 8, 2009.  (Tr. 344).

9

straight home and take her medications.  Her Hemoglobin A1c was 9.0 on January

20, 2012.  (Tr. 373).

On March 5, 2012, claimant complained of back, neck and right upper pain,

and numbness to the right thigh.  (Tr. 316).  Her blood pressure was 135/88, and

weight was 236.2.  (Tr. 317).  On examination, her back was tender to palpation

over the lower spine.  Range of motion of the lumbar spine was normal.  Straight

leg raising test was negative.

Claimant had normal range of motion of all joints in the upper and lower

extremities.  She ambulated with a steady gait.  Motor and sensory exam was

intact in the extremities.  She had decreased sensation at the right lateral thigh

area.

Glucose was 212 mg/dL.  Hemoglobin A1c was 9.0.  The assessment was

obesity, Type 2 diabetes mellitus – uncomplicated and uncontrolled, diabetic

peripheral neuropathy, and lower back pain.

On June 4, 2012, claimant complained of neck pain radiating to her right

upper arm.  (Tr. 314).  She also reported that her fasting blood sugars had been in

the 160s, despite taking her medications as ordered.

Claimant's blood pressure was 148/85, and weight was 241 pounds.  (Tr.

315).  Neck range of motion was normal.  She had decreased range of motion in

10

the right upper extremity.  She had calluses to her bilateral plantar feet.  Motor and sensory exam was intact in the feet.

The assessment was lower back pain, neck pain, Type 2 diabetes mellitus – uncomplicated and uncontrolled, abnormal heart sounds, morbid obesity, and callus.  She was instructed to lose weight.  (Tr. 316).

On June 6, 2012, claimant's chief complaint was very low Vitamin D.  (Tr. 314).  Her Hemoglobin A1c was 10.1.  (Tr. 372).  The assessment was Vitamin D deficiency.  (Tr. 314).

On August 1, 2012, claimant complained of paralysis to the right side of her face and headache for five days.  (Tr. 311).  On examination, her blood pressure was 142/74, and weight was 239 pounds.  (Tr. 312).  Straight leg raising test was negative.

Claimant had an abnormal facial droop.  Sensory exam  showed decreased right facial sensation.  Motor exam demonstrated no dysfunction.  Gait and stance and reflexes were normal.

The assessment was resolved wheezing and acute bronchitis, daily persistent headache, uncontrolled Type 2 diabetes mellitus with complication, and mouth droop.  (Tr. 313).

On August 9, 2012, claimant had greatly improved since starting medication. (Tr. 366). On examination, her blood pressure was 143/76. (Tr. 367). Her weight was 239.6. Cardiac, musculoskeletal, and neurological examinations were normal. (Tr. 367-68). The assessment was Bell's palsy, Type 2 diabetes mellitus with complication – uncontrolled, hyperlipoproteinemia type II-B, and benign essential hypertension. (Tr. 369).

On September 10, 2012, claimant complained of soft tissue swelling to her hands and feet for the past two weeks. (Tr. 357). Her blood pressure was 134/84, and weight was 244.6. (Tr. 358).

On examination, claimant's feet showed no abnormalities. Her A1c was 11.3, and estimated average glucose was 278. (Tr. 360). The assessment was resolved mouth droop, persistent headache and Bell's palsy; hyperlipoproteinemia; Type 2 diabetes mellitus with complication – uncontrolled; morbid obesity; diabetic peripheral neuropathy; asthma, and benign essential hypertension. (Tr. 361).

On November 8, 2012, claimant complained of chest congestion. (Tr. 348). Her blood pressure was 147/83, and weight was 247.2. (Tr. 349). Her feet showed no abnormalities. The assessment was Type 2 diabetes mellitus with

complication – uncontrolled, morbid obesity, diabetic peripheral neuropathy, benign essential hypertension, and hyperlipoproteinemia.

On January 16, 2013, claimant's medications included Glipizide, Bystolic, Lipitor, Aspirin, Symbicort, ProAir, Fish Oil, Lantus solostar, NovoLog, Janumet, Singulair, Nasonex, and Micardis HCT.  (Tr. 347).

**(10) Claimant's Administrative Hearing Testimony**.  At the hearing on March 13, 2013, claimant testified that she had last worked in May, 2011, as an administrative assistant at a home health agency.  (Tr. 30).  She said that her boss fired her because she did not follow up with having two new hires getting their TB skin tests done.  (Tr. 30-31).  Additionally, she had worked as an accounting clerk for various businesses from 2003 to 2011.

Claimant testified that after she left the agency, she received unemployment benefits until November of 2012.  (Tr. 32).  She stated that she continued to look for work after her unemployment stopped.

Claimant testified that while working at her last job, she had trouble with concentration.  (Tr. 33).  She said that her boss would give her "an order what to do, and I would write it down; but it was kind of – just couldn't focus."  (Tr. 33). Claimant also testified that her boss told her to "check with your doctor to see if your diabetes is not causing any trouble."  (Tr. 33).

13

Additionally, claimant reported that her hours at the agency dropped from 40 hours a week to 20 hours a week.  (Tr. 36).  She said that her boss told her that it was because of budget cuts, but her boss did not change the other two workers' hours.  She stated that after her boss reduced her hours, she worked part-time in accounting at a gambling place for about three weeks.  (Tr. 38).  She testified that her boss let her go because claimant could not keep up with everything due to her concentration and memory problems.

Claimant also stated that prior to that, she had been fired from another job at a home for the mentally ill because of a medication error.  (Tr. 39).

Regarding activities, claimant testified that she had a driver's license and drove locally.  (Tr. 34).  She stated that she washed dishes, but had to stop and sit down due to back pain and fatigue.

Claimant reported that her diabetes medications were working better now.  (Tr. 40).  However, she still had blood sugar fluctuations throughout the day.  She said that her diabetes caused a lot of fatigue.  She said that she had good days and bad days.  (Tr. 41-42).

Additionally, claimant reported that she had problems with neuropathy in her hand and leg.  (Tr. 45).  She also had blurry vision after being on the computer for less than an hour.

**(11) Administrative Hearing Testimony of Lionel J. Bordelon,**

**Vocational Expert ("VE")**.  Mr. Bordelon testified that claimant's job at the

home health agency in human resources and as an accounting clerk would both be

classified as sedentary with a Specific Vocational Preparation ("SVP") of five.

(Tr. 31).  The ALJ posed a hypothetical in which he asked the VE to assume a

claimant with the capacity for light work, reduced by the requirement that postural

activity would be no more than occasional and no overhead reaching.  (Tr. 32).

He confirmed that claimant would be able to do her prior work.

**(12) The ALJ's Findings**.  Claimant argues that: (1) the ALJ's credibility

finding was reached through application of improper legal standards and is not

supported by the evidence; the ALJ failed to consider claimant's 36-year work

history and proper reason for termination, and (2) the ALJ's residual functional

capacity assessment was reached through application of improper legal standards

and is not supported by the evidence; the ALJ failed to account for claimant's

problems in maintaining attention and persisting over a 40-hour work week.

First, claimant argues that the ALJ failed to consider information regarding

her prior work record in assessing her credibility.  Specifically, she asserts that a

claimant with a good work record is entitled to substantial credibility when

claiming that she can no longer work due to a disability.  *See, Melancon v. Astrue*,

2012 U.S. Dist. LEXIS 106882, at *19 (W.D. La. June 6, 2012) (citing cases from other circuits).   However, while claimant is correct that there is jurisprudence from other circuits holding that a claimant with a good work record is entitled to substantial credibility when claiming that she can no longer work due to a disability, the record reflects that claimant had been terminated from other jobs for reasons unrelated to her alleged disability.

In determining claimant's RFC, the ALJ considered claimant's testimony regarding her daily activities, restrictions and symptoms.  He noted that she testified that she was fired from her last job at a home health agency for failing to obtain a TB skin test.  (Tr. 19-20).  Claimant asserts that the ALJ "misunderstood" the basis for her termination, and that she was actually terminated for making errors due to complications from diabetes, including forgetting to follow up on the status of staff TB tests.  [rec. doc. 10, p. 7].

At the hearing, claimant testified that she was fired because she did not follow up with having two new hires getting their TB skin tests done.  (Tr. 30-31).  Later, she suggested that she was actually terminated from that job and from the casino because of concentration and memory problems.  (Tr. 33, 38).  However, she reported to Dr. Buxton that she was "laid-off due to a downturn in the

16

economy."  (Tr. 258).  Further, she testified that she had been fired from a job at a

mental health facility due to a "medication error."  (Tr. 39).

Regardless of whether the ALJ "misunderstood" the reasons for claimant's

termination from her job at the home health agency, the law is settled that the ALJ

has the primary responsibility for resolving conflicts in the evidence.  *Chambliss*

*v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Carrier v. Sullivan,* 944 F.2d 243,

247 (5th Cir. 1991).  In this case, claimant contradicted herself regarding the

reasons she had been fired from her last job at different points in the hearing and

in her report to Dr. Buxton.   Thus, the ALJ's credibility determination is entitled

to great deference.  *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000).

Next, claimant argues that the ALJ's residual functional capacity assessment

is not supported by the evidence.  Specifically, she asserts that the ALJ failed to

account for her problems in maintaining attention and persisting over a 40-hour

work week.

In support of his RFC determination, the ALJ considered claimant's

testimony regarding her activities, restrictions and symptoms.  (Tr. 19).  He noted

that she attended to her personal needs, but occasionally required assistance;

prepared meals, did laundry, ironing and cleaning; shopped in stores, by phone, by

mail and by computer; was able to handle money including paying bills and

maintaining a checking account; went to church and visited with family, and had problems with handling stress, but was able to handle changes in routine. This is confirmed by claimant's testimony and the Function Report – Adult, in which claimant indicated that she bathed and dressed herself, did some laundry, swept, folded clothes, ironed, cleaned, prepared meals daily, walk, drove, shopped, paid bills, ordered supplies, attended church twice a week, went to family gatherings, listened to music, and was able to pay bills, count change, and use a checkbook/money orders. (Tr. 20; 192-95). It is appropriate to consider the claimant's daily activities when deciding the claimant's disability status. *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995).

Regarding claimant's assertion of problems in maintaining attention and persistence, the ALJ noted that claimant had no limitation in this area. (Tr. 16). In support of his finding, he cited Dr. Buxton's report indicating that claimant's ability to attend and concentrate was good, and that pace was even with a regular rate of performance and a normative response latency. (Tr. 258). Additionally, Dr. Martin determined that claimant had no difficulties in maintaining concentration, persistence or pace. (Tr. 51). It is well established that claimant's subjective complaints must be corroborated at least in part by objective medical

testimony.  *Houston v. Sullivan* 895 F.2d 1012, 1016 (5th Cir. 1989) (*citing Harrell v. Bowen,* 862 F.2d 471, 481 (5th Cir.1988)).  That is not the case here.

Additionally, claimant argues that the ALJ failed to consider her frequent fluctuations in blood glucose levels and the effects of such changes on her ability to persist at work activity on a sustained basis.  [rec. doc. 10, pp. 7-8].  However, a review of the decision reflects that the ALJ did consider the effect of her diabetes, citing the medical records as well as her claimant's testimony that her blood sugar levels were improved with medication.[2]  (Tr. 19-20).  If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability.  *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).  Thus, the ALJ's opinion is entitled to deference.

Another factor cited by the ALJ in reaching his decision was claimant's "generally unpersuasive appearance and demeanor" while testifying at the hearing. (Tr. 21).  He noted that claimant was able to maintain attention and concentration to the degree required for participation at the hearing, and interacted appropriately

---

[2]The undersigned also notes instances in the record indicating that claimant was not taking her medication as prescribed.  (Tr. 320, 325).  It is well established that failure to follow prescribed medical treatment precludes an award of benefits.  20 C.F.R. § 416.930(a), (b); *Johnson v. Sullivan*, 894 F.2d 683, 685, n. 4 (5th Cir. 1990).

with the ALJ and other persons present in the hearing room.  (Tr. 21).

Additionally, he observed no evidence of pain or discomfort during the hearing.  It

is settled that the absence of objective factors indicating the existence of severe

pain – such as limitations in the range of motion, muscular atrophy, or impairment

of general nutrition – could itself justify the ALJ's conclusion.  *Hollis v. Bowen*,

837 F.2d 1378,1384 (5th Cir. 1988).

Further, the ALJ noted that the record did not contain any opinions from

treating or examining physicians indicating that claimant was disabled or even had

limitations greater than those determined in his decision.  (Tr. 21).  Additionally,

he observed that her treating doctor had not imposed any restrictions on her.  He

found that claimant had a history of multiple complaints of pain, with objective

findings consistent with some abnormalities, but short of what would be expected

from a person who was completely disabled.  (Tr. 21-22).

The ALJ's finding as to claimant's credibility is entitled to great deference.

*Newton*, 209 F.3d at 459; *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995);

*Harper v. Sullivan*, 887 F.2d 92, 97 (5th Cir.1989) (substantial evidence supported

ALJ's finding that claimant's subjective symptomology not credible when no

physician on record stated that claimant was physically disabled).

Finally, claimant argues that the ALJ's hypothetical to the vocational expert was defective because he failed to address her difficulties in maintaining attention nor persisting over a 40-hour work week due to her medical impairments. [rec. doc. 10, p. 9]. She further notes that she was demoted from 40 hours to 20 hours per week due to her declining abilities in 2010 and her lost income as a result. Thus, she argues, the evidence shows that she was unable to consistently perform full-time work since 2010 as a result of her impairments.

As to claimant's ability to maintain attention, the ALJ cited Dr. Buxton's opinion that claimant had no limitation as to concentration, persistent or pace. (Tr. 16, 259). Additionally, the ALJ noted Dr. Buxton's finding that if claimant were able to secure and maintain gainful employment within the general community at large, it would be "somewhat therapeutic" for her. (Tr. 17, 260). He gave great weight to Dr. Buxton's opinion, and no medical evidence exists to the contrary.

It is well established that the ALJ is not bound by VE testimony which is based on evidentiary assumptions ultimately rejected by the ALJ. *See Owens v. Heckler,* 770 F.2d 1276, 1282 (5th Cir. 1985). As the ALJ's hypothetical to the vocational expert reasonably incorporated all disabilities of the claimant recognized by the ALJ, and the claimant or her representative had the opportunity to correct deficiencies in the ALJ's question, the ALJ's findings are entitled to

21

deference.  *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT,**

**EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed August 31, 2015, at Lafayette, Louisiana.

_____
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE